# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00736-CV

---

**R. F., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 126TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-FM-23-008592
THE HONORABLE AURORA MARTINEZ-JONES, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

R.F. (Mother) appeals the termination of her parental rights, contending that the evidence was insufficient to support termination and that her counsel rendered ineffective assistance. We will affirm the judgment.

## BACKGROUND

In November 2023, Mother and her child (Child) tested positive for methamphetamines and amphetamines at his birth. On November 21, 2023, the Texas Department of Family and Protective Services filed a petition for an order requiring Mother to participate in services intended to alleviate the effects or risks of abuse or neglect and reduce a continuing danger to the child's physical health or safety. The case became a conservatorship proceeding in June 2024, and the Department finalized a service plan in July 2024. Child has

remained with Aunt Kelly, Mother's sister, since removal. The service plan required Mother to obtain employment, maintain a safe and appropriate home, complete a parenting-skills class, and complete an inpatient drug/substance treatment program at a rehabilitation facility.

The trial court held pretrial hearings on May 30, 2025, and June 9, 2025, and a trial on the merits on August 11-12, 2025. By order dated September 2, 2025, the trial court terminated Mother's parental rights to Child. The court found clear and convincing evidence of several grounds for termination. *See* former Tex. Fam. Code § 161.001(b)(1)(E), (N), (O), (P). (R).[1] The court also found that the Department made reasonable efforts to reunify Mother and Child and that termination of parental rights was in Child's best interest.[2]

## DISCUSSION

Mother contends that the evidence is legally insufficient to support a finding by clear and convincing evidence that the Department made reasonable efforts to reunite Mother with her child, that any of the grounds for termination exist, or that termination of parental rights was in Child's best interest. She also contends that her attorney rendered ineffective assistance,

---

[1] We note that the Legislature amended section 161.001 twice in the 2025 regular session. The amendment in relevant part deleted ground for termination (O) and relettered grounds (P) and (R) as grounds (O) and (Q), respectively. *See* Act of May 14, 2025, 89th Leg., R.S., Ch. 211, § 2, 2025 Tex. Gen. Laws ___, ___ (eff. Sept. 1, 2025) (amending Tex. Fam. Code § 161.001(b)(1)); *see also* Act of May 14, 2025, 89th Leg., R.S., Ch. 211, § 2, 2025 Tex. Gen. Laws ___, ___ (eff. Sept. 1, 2025) (amending Tex. Fam. Code § 161.001(c)). The amendments were effective on September 1, 2025, and applied to "suits affecting the parent-child relationship that [were] pending in a trial court" on September 1, 2025. For consistency with the record, we will refer to the statutory grounds as they were codified in the statute applicable at the time of the petition and trial. We will not base our opinion on former ground (O).

[2] The alleged father, J.W., does not appeal the termination of his parental rights to Child.

2

chiefly by failing to request a recess or continuance to allow Mother to testify in the termination hearing and by his inaction in defending Mother's interest during trial.

## I.    The evidence is sufficient to support the final decree of termination.

### A.   The standard of review

We review the legal sufficiency of the evidence supporting a trial court's termination decree under well-established standards. The Department must prove by clear and convincing evidence that at least one statutory ground for termination exists and that termination is in the child's best interest. *See* Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007. In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and assume the factfinder resolved disputed facts in favor of its finding. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). An appellate court must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Reviewing courts must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence. *In re R.R.A.*, 687 S.W.3d 269, 279 n.50 (Tex. 2024).

3

### B. Grounds for termination

#### 1. Ground (E)

Mother contends that the evidence supporting termination under Ground (E) is insufficient because it consists solely of testimony and a report that she and Child tested positive for amphetamines and methamphetamines at Child's birth.

The Family Code authorizes termination of parental rights if the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "'Endanger' means 'to expose to loss or injury; to jeopardize.'" *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861 at *4 (Tex. App.— Austin Dec. 23, 2010, no pet.) (mem. op.). A parent's endangering conduct need not be directed at the child, nor must the child actually suffer injury. *In re R.R.A.*, 687 S.W.3d at 277. "Instead, endangerment encompasses a larger array of conduct that exposes a child to loss or injury or jeopardizes the child." *Id*. (cleaned up). A factfinder may infer endangerment from a course of conduct that presents substantial risks to the child's physical or emotional well-being. *Id*. The conduct does not have to occur in the presence of the child, and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt*, 2010 WL 5463861 at *4; *see In re C.E.*, 687 S.W.3d 304, 310 (Tex. 2024) (stating that (D) and (E) grounds "do not require that endangering 'conduct be directed at the child' or that the child 'actually suffer[] injury'" (quoting *In re J.W.*, 645 S.W.3d 726, 748 (Tex.

4

2022))). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Pruitt*, 2010 WL 5463861, at *4.

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied); *see In re C.E.*, 687 S.W.3d at 310 (stating that subsection (E) "requires that a parent's conduct endanger the child's physical or emotional well-being" but that "[p]roof that a parent specifically caused an injury is not necessary"). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.E.-M.N.*, 342 S.W.3d at 262. The relevant time period for Texas Family Code § 161.001(b)(1)(E) includes parental conduct occurring "both before and after the child has been removed by the Department." *D.N.-B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00092-CV, 2020 WL 4462327, at *2 (Tex. App.—Austin July 24, 2020, pet. denied) (mem. op.).

Although a finding of endangerment based on drug use alone is not automatic, a parent's positive tests during the pendency of a termination case support a finding that the parent's illegal drug use is an ongoing habit that created an endangering environment for the child. *D.H. v. Texas Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 61 (Tex. App.—Austin 2021, no pet.). A parent's ongoing drug use jeopardizes the parent-child relationship and subjects the child to a life of uncertainty and instability. *Id*. at 62. Pervasive drug use can cause a reasonable inference that the drug use is endangering even in the absence of evidence that drug use caused an endangering activity or that it occurred while the children were in the parent's direct care. *Id*. at 61.

5

Mother contends that the evidence is insufficient to support termination based on subsection (E) because it consists solely of the investigator's testimony and report that Mother and Child tested positive for amphetamine and methamphetamine at birth and that the referral to the Department included a statement that Mother admitted drug use; the report also stated that Child was not showing signs of withdrawal after birth. Mother contends this record is deficient without medical records or statements from medical personnel or anyone other than Department employees or the court-appointed special advocate.

The evidence of Mother's drug use during pregnancy is sufficient to support the trial court's finding that Ground (E) exists. "A mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Though there are no test results or medical-professional testimony in the record, the evidence is undisputed that Mother used methamphetamine and amphetamine during her pregnancy such that she and Child tested positive for those drugs at his birth. Even without signs of withdrawal at birth, the use of amphetamines during pregnancy can cause long-term side effects such as learning defects, failure to thrive, and damage to the neural system. *See id.* at 127. In addition to the testimony at trial, the Plan of Service report prepared when Child was eight months old states that Mother "has admitted to substance/abuse. She has stated that her drug of choice is methamphetamine, amphetamines, and marijuana. She engaged in substance use while caring for her child." The report further stated that, at eight months old, Child had a 57% delay in social-emotional skills, a 14% delay in fine motor skills, and a 14% delay in cognitive skills. Child's caregiver, Aunt Kelly, testified that she was not comfortable with Mother sharing conservatorship because Mother was "still using."

6

We conclude that the record contains legally sufficient evidence for the court to find that clear and convincing evidence supports a finding that Mother engaged in conduct that endangered Child's physical or emotional well-being.

### 2. Remaining grounds

Only one predicate finding under section 161.001 is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We need not review the challenge to the sufficiency of the evidence supporting the other predicate grounds. *See* Tex. R. App. P. 47.1.

## C. Best interest of the child

We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Although a parent's behavior may reasonably suggest that a child would be better off with a new family, the best-interest standard does not

7

permit termination merely because a child might be better off living elsewhere. *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.). "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

Mother testified in a pretrial hearing that Child was her "little love bug" and would always know her. Department witnesses testified that visits between Mother and Child that occurred went well. She attempted to arrange drug treatment, engaged in therapy, and periodically maintained sobriety despite some "slipups." Though Mother did not appear at trial until after the court had announced termination of Mother's parental rights, Mother said on the record that she was willing to take a drug test. Mother had endured losses arising from a July 2024 fire that killed several family members including her mother, whose body remained in the morgue or funeral home for months until Mother obtained funds to pay for cremation.

Evidence concerning Mother's continued drug use and the disruptions in her life contrasted with the stability of Child's placement supported the finding that Child's best interests were served by termination of Mother's parental rights on several of the *Holley* factors. Because Mother and Child tested positive for drug use at his birth, Mother had sole possession of Child for less than two weeks of his life. In response to the trial court's question in May 2025 about whether she was still struggling with methamphetamine use, Mother conceded that she still had "slight slipups" and needed drug-abuse treatment even while several months pregnant with another child. Mother's participation at that hearing was interrupted by phone calls while she was talking with the court. At the outset of the August trial, the court described Mother's

8

previous presentation at the hearing as "chaotic." CASA Madison Lozano testified that Mother attended maybe one-third of available visits with Child. Lozano testified that Mother did not complete drug treatment, have stable employment, or stable housing. Mother said at the May 30 hearing that she had a job and could take leave while in drug treatment. Lozano said that Mother did not focus on the substance abuse that brought Child into care and fixated on complaints about other people. Department caseworker Crystal Sanchez testified that Mother did not drug test regularly, was unstable in terms of housing, and did not have a consistent phone number. Sanchez testified that Mother attended a medical appointment with Child and verbally authorized some immunizations, then said she had to go to the restroom and never returned. When Sanchez made a phone call after a court hearing to set up in-patient drug treatment, Mother became agitated and left. Department caseworker supervisor Isela Ortiz testified that she was concerned with Mother's lack of consistency in making parent-child visits and her failure to successfully complete drug treatment. Child's Aunt Kelly testified that she initially supervised Mother's visits but that scheduling and communications issues caused her to ask for Department supervision; she said that when the Department took over, there were no incidents "other than lots of visits were cut short." She said Mother visited Child on his November 2024 birthday, then not again until February 2025, then not again until June 2025.

These concerns contrasted with the evidence concerning the placement with Child's Aunt Kelly. Lozano testified that Child was very comfortable and happy in that placement, seemed very bonded with the cousins who lived there, and was comforted by his Aunt Kelly, her fiancé, and her mother. Ortiz testified that Child was thriving and bonded with his caregivers. She said that termination and possible adoption would allow him safety and stability that he would need and would allow him "to live as normal a life as possible." Child's

9

Aunt Kelly testified that her children, aged one and four, played well with Child, aged almost two. She testified that she wanted to adopt Child and that "[h]e's part of our family already."

The evidence supports a finding that Mother lacks the ability to provide for Child's emotional and physical needs now and in the future. She did not maintain consistent employment, housing, or phone numbers. She left a Department caseworker attempting to obtain drug treatment for her and left Child's medical appointment without notice. She demonstrated parenting abilities during successful visits with Child but attended only one-third of the available visits and left some early. While there are programs that could help Mother, her use of offered programs was incomplete. The loss of family members and long-lasting disruptions arising therefrom explain some of her struggles, and the challenges of getting insurance to pay for an available treatment facility while she was pregnant with another child explain some of the failure to complete drug treatment. But Mother's drug use was a consistent theme, predating Child's birth and persisting through a stint in treatment, the fire, and Child's life—including her pregnancy with a new sibling. Viewed most favorably to the judgment, we conclude that the record supports a finding by clear and convincing evidence that termination of Mother's parental rights is in Child's best interest

## D. Reasonable attempt at reunification

Mother contends that the record does not support the trial court's recitation that the Department actually engaged in reasonable efforts to reunify her with Child. A court may not terminate parental rights unless it finds by clear and convincing evidence and describes in writing with specificity that the Department made reasonable efforts to return the child to the

parent before trial and that, despite those efforts, a continuing danger remains in the home that prevents the return of the child to the parent. Tex. Fam. Code § 161.001(f).

"Generally, implementation of a family service plan by [the Department] is considered a reasonable effort to return the child to the parent." *A.D. v. Texas Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 714 (Tex. App.—Austin 2023, no pet.) (quoting *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.)); *see also D.F. v. Texas Dep't of Family & Protective Servs.*, No. 03-25-00738-CV, 2026 WL 482451, at *8 (Tex. App.—Austin Feb. 20, 2026, no pet. h.) (holding courts examining issues under Tex. Fam. Code section 161.001(f) can look to jurisprudence about reunification attempts under section 161.001(b)(1)(N)). There is no dispute that the Department developed a plan of services for Mother dated July 26, 2024, after this case converted to conservatorship.

Mother argues, however, that the Department did not prove it worked to implement the plan. She contends that insufficient evidence supports the trial court's findings. We will consider the findings in turn.

### 1. The Department worked with Respondent Mother for admission into the Travis County Drug Court and parenting-in-recovery program.

The Department's Freeman testified that Mother did not go to drug court and CASA Lozano testified that she started on the case "once drug court was no longer an option." Neither witness explained the Department's efforts to get her into drug court and no witness mentioned the parenting-in-recovery program for the Travis County Drug Court. Sanchez by affidavit averred that, at the November 9, 2023 Family Team meeting, the parenting-in-recovery service manager Michelle Kimbrough explained the Drug Court Program to Mother and said that Mother appeared to be a great fit for the program; Mother declined to participate in the program

because she wanted to find treatment on her own. In her affidavit, Freeman stated that, on November 10, 2023, Mother said she was thinking about drug court; Freeman referred her to Kimbrough for questions about drug court and the treatment facilities available. Freeman averred that on November 13, 2023, Mother said she did not want to participate in the Drug Court Program, which included the parenting-in-recovery services.

Sufficient evidence supports the finding, though the amount of work was brief because Mother opted against the programs within five days.

**2. The Department offered Respondent Mother drug treatment options multiple times, including assisting her with phone calls and discussing different types of treatment options.**

Freeman, by testimony and affidavit, said that the Department initially offered treatment options available through the Drug Court Program, but Mother chose to attend a program in Houston that she left after two weeks. When caseworker Sanchez was asked if the Department offered Mother options for further drug treatment during her time on the case, Sanchez responded, "Yes." She testified that, after the case turned to conservatorship in June 2024, she discussed the difference between and pros and cons of in-patient versus outpatient treatment. Sanchez testified, "We attempted to call a few times. And I believe at least one, she walked away from me before we could complete that. . . . She became agitated and left." Sanchez stated later that she "was referring more to just talking to her about it" than making actual calls. Viewed most favorably to the decree, the record contains sufficient evidence to support the finding.

### 3. The Department worked with Respondent Mother to obtain a safe placement of the child.

Mother does not dispute that Child was in a safe placement with Aunt Kelly or that the Department took steps to ensure the safety of that placement. Mother contends that this finding does not show steps toward reunification. However, this Court has held that the Department's placement of child with a family member is evidence of an attempt at reunification. *See A.D.*, 673 S.W.3d at 714 (citing *In re L.C.M.*, 645 S.W.3d 914, 922 (Tex. App.—El Paso 2022, no pet.) ("[T]he Department's efforts to place the child with relatives constitutes legally and factually sufficient evidence that reunification was attempted.")). Sufficient evidence supports this finding.

### 4. The Department offered visits to Respondent Mother, including moving their times and locations to accommodate her schedule.

Visits were undisputedly offered. Sanchez testified that an HST[3] transported Mother to Lockhart for visits. CASA Lozano testified that Mother made one or two visits in June 2025 and that "[t]hey had the visits moved to Austin per [Mother's] request." Mother acknowledges that in the May 30 hearing she said she had requested that visits be moved to Austin due to her pregnancy and transportation difficulties but had not at that time heard back from the Department. These assertions are consistent with the Department moving the visits after the May 30 hearing.

Mother points to discrepancies between Ortiz's testimony that Mother attended nine visits and Mother's attorney's statement that she made twenty visits as showing weakness in

---

[3] The Department's website explains that a "Human Services Technician helps staff and supervisors by providing certain services to CPS clients" including transporting clients. *See* https://www.dfps.texas.gov/Jobs/CPS/human_services_tech.asp (last visited March 18, 2026).

the evidence. The complained-of discrepancy regarding the number of visits does not bear on the finding regarding the availability and moving of visits.

Sufficient evidence supports this finding.

**5. The Department offered a Court Ordered Services case to avoid immediate danger to the child and the need to take conservatorship of the child.**

The finding that the case began as a Court Ordered Services case is undisputed, as is the fact that the Department did not seek conservatorship until after offering services. The reasonableness of other efforts at reunification is outside the scope of this finding.

Sufficient evidence supports this finding.

**6. The Department provided Respondent Mother referrals and payment for services such as therapy and psychological evaluations.**

Mother concedes that the report from Mother's psychological evaluation states that the CPS caseworker referred Mother for the evaluation. In her affidavit, Sanchez recounts that she and Mother discussed "her services and referrals" on January 24, 2024, which included a discussion of her therapy. Sanchez averred that in February 2024, she and Mother called to find funding options for treatment, but they were unable to reach someone to talk with.

Mother asserts that there is no evidence regarding the Department providing payment for services, and the Department did not respond by pointing to any such evidence in the record.

Sufficient evidence supports the finding regarding referrals, but not as to payment.

### 7. The Department offered Family Team Meetings.

In her Affidavit in Support of Extraordinary Relief, Sanchez averred that Family Team Meetings occurred on November 9, 2023, and March 8, 2024. No evidence contradicts that statement. Sufficient evidence supports the finding.

### 8. The Department offered Respondent Mother transportation to drug testing, visits, and drug treatment programs.

Sanchez testified that she discussed transportation struggles with Mother and offered transportation to an in-patient rehabilitation facility, that she provided bus passes, and that an HST was offered for many, if not all, drug tests as well as parent-child visits.

Mother contrasts this testimony with only two mentions in Sanchez's affidavit of transportation being provided as a 'discrepancy" that fatally undermines the testimony. It does not. We must defer to the factfinder's assessment of credibility and the weight given to evidence. *See R.R.A.*, 687 S.W.3d at 279 n.50. Sufficient evidence supports the finding.

### 9. Summary

The decree does not stand or fall on the sufficiency of the evidence supporting any of these individual findings. Our review of these individual findings is in service to the overarching inquiry regarding whether the record supports a finding that the Department made reasonable efforts to return Child to Mother and that despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent. *See* Tex. Fam. Code § 161.001(f)(1).

We conclude that the record contains legally sufficient evidence to support the trial court's finding that the record contains clear and convincing evidence of such reasonable efforts. The record showed a danger to the child from Mother's continued use of

15

methamphetamine during the pendency of this case and her pregnancy with Child's sibling. *See In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (illegal drug use can endanger child by "expos[ing] the child to the possibility that the parent may be impaired or imprisoned"). The Department undisputedly developed a plan of services intended to reunify Mother and Child, which is considered a reasonable effort to return the child to the parent. *See A.D.*, 673 S.W.3d at 714. The plan included parent-child visits, and evidence showed that the Department facilitated some by providing transportation and changing schedules. The Department placed Child with a family member who initially supervised Mother's visits until she requested Department supervision because of scheduling and communication issues with Mother. Department employees discussed treatment options with Mother, and Mother sought her own providers.

Viewed most favorably to the decree, the record contains sufficient evidence from which the trial court could find clear and convincing evidence that the Department made reasonable efforts to reunite Mother and Child.

## II. The record does not show that Mother's counsel provided ineffective assistance.

Mother contends that her counsel was ineffective chiefly by failing to request a recess or continuance so that she could testify during the trial and by his inaction in defending her interests at trial.

### A. The right to counsel and the standard of review for counsel's effectiveness

The statutory right to counsel in parental-rights termination cases includes, as a matter of due process, the right to effective counsel. *C.S.F. v. Texas Dep't of Fam. & Protective Servs.*, 505 S.W.3d 618, 619 (Tex. 2016). Proving ineffective assistance of counsel requires

showing: (1) commission of errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense—i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). We must determine "whether counsel's defective performance caused harm; in other words, whether 'there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different.'" *Id*. at 549–50 (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). "Thus, an ineffective assistance of counsel claim requires a showing of a deficient performance by counsel so serious as to deny the defendant a fair and reliable trial." *In re J.O.A.*, 283 S.W.3d 336, 342 (Tex. 2009). An assertion of ineffective assistance will be sustained only if the record affirmatively supports such a claim. *A.D.*, 673 S.W.3d at 719–20. The parent has the burden to prove by a preponderance of the evidence that counsel was ineffective. *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 707 (Tex. App.—Austin 2019, pet. denied).

"With respect to whether counsel's performance in a particular case is deficient, we must take into account all of the circumstances surrounding the case, and must primarily focus on whether counsel performed in a 'reasonably effective' manner." *In re M.S.*, 115 S.W.3d at 545. "[C]ounsel's performance falls below acceptable levels of performance when the 'representation is so grossly deficient as to render proceedings fundamentally unfair[.]'" *Id*. (quoting *Brewer v. State*, 649 S.W.2d 628, 630 (Tex. Crim App. 1983)). "In this process, we must give great deference to counsel's performance, indulging 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' including the possibility that counsel's actions are strategic." *Id*. (quoting *Strickland*, 466 U.S. at

17

689). "The challenged conduct will constitute ineffective assistance only when 'the conduct was so outrageous that no competent attorney would have engaged in it.'" *In re D.T.*, 625 S.W.3d 62, 74 (Tex. 2021) (quoting *In re M.S.*, 115 S.W.3d at 545). "Ordinarily, counsel should not be condemned as unprofessional or incompetent without an opportunity to explain the challenged actions." *In re S.L.*, 188 S.W.3d 388, 395 (Tex. App.—Dallas 2006, no pet.). "In a parental-rights termination case where the parent asserts on appeal the ineffective assistance of trial counsel, but nothing in the record indicates trial counsel's reasons or strategies for the complained-of conduct, the lack of a record is practically always fatal to the parent's appellate issue." *In re K.K.*, No. 10-04-00303-CV, 2006 WL 561820, at *3 (Tex. App.—Waco Mar. 8, 2006, no pet.) (mem. op.).

The standard of review is more deferential to counsel's actions when the claim is made for the first time on appeal because the reasonableness of counsel's choices typically involves facts not appearing in the appellate record. *In re J.J.*, 647 S.W.3d 524, 530 (Tex. App.—Texarkana 2022, no pet.). "When the record is silent regarding trial counsel's reasons for his actions, we may not speculate to determine whether trial counsel is ineffective." *In re L.D.L.H.*, No. 04-15-00146-CV, 2015 WL 6507834, at *4 (Tex. App.—San Antonio Oct. 28, 2015, pet. struck) (mem. op.). "Thus, when the record is silent regarding counsel's reasons for his conduct," as it is here, "we defer to counsel's decision if there is at least the possibility that the conduct could have been legitimate trial strategy." *In re S.L.*, 188 S.W.3d at 395. Stated another way, if counsel "may have acted in accordance with a plausible strategy," we will not find counsel's conduct deficient. *See In re L.G.R.*, 498 S.W.3d 195, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

18

### A. Counsel's performance

#### 1. Failing to request a delay of trial

Mother acknowledges that her attorney orally requested a continuance on the first day of trial at the outset and obtained a recess after the Department closed so that she might appear the next day, but she faults him for not requesting an additional recess after the trial resumed. She was the only witness he intended to call, and she did not arrive until after the trial court ruled.

On the first day of trial, counsel reported that Mother was at the hospital experiencing Braxton Hicks contractions in the eighth month of pregnancy. He said that she wanted a short extension so that she could proceed on her own and that she wanted a jury. The trial court said that it had previously delayed trial to allow Mother to obtain treatment that she did not complete and that it wanted proof that she was hospitalized before it would delay trial further. The court denied the oral motions for continuance, to withdraw counsel, and for a jury. The court said that if it received some formal documentation from a hospital about Mother's circumstances it would consider resuming the trial at another time, but that in light of the previous extension, it did not find it prudent for the court or in Child's best interest to delay the trial further without better proof of Mother's condition.

The Department proceeded with its case. After the fifth witness testified, the Department rested after saying that it would have called Mother had she appeared; the Department opined that Mother's testimony would have been similar to the facts before the court. Mother's attorney then requested and received a recess until the next day so that Mother could testify. The court requested that Mother bring documentation from the hospital to explain Mother's circumstances. The court set the trial to resume at 10:30 a.m. the next day.

On the second day, trial started over ten minutes past the scheduled start time; Mother's counsel reported that she had "texted several times this morning, indicated that she was going to bring the hospital records, but has since ceased" communications an hour prior to the resumption of trial. He asked and received the opportunity to check the hallway again and the court sent staff to another floor to look for Mother; he also said he called Mother and got no answer. After an unsuccessful search during the recess, counsel closed without calling a witness. The trial court announced its decision. As the court concluded, Mother came into the courtroom claiming she had car trouble. When the court instructed her to talk to her attorney, Mother said, "I don't want a lawyer. I don't want a lawyer. I want to be able to represent myself. And I want to be able to be heard on this. I can pee clean right now." The court instead ended the proceeding. There is no indication of whether Mother brought any hospital records.

In light of the court's recitation of its history with this case and with Mother, it is not clear what additional request counsel could have made of the court. He brought the issue of Mother's absence to the court's attention, and the court granted limited leeway, then proceeded to its decision.

### 2. Inaction at trial

Mother complains that her attorney made only one objection and engaged in limited cross-examination (only eighteen pages of the reporter's record). She complains that he did not cross-examine CASA volunteer Lozano on her testimony that Mother had openly admitted use of methamphetamine multiple times throughout the case and has admitted to drug use during the case after Child was removed. Mother asserts that this testimony "provided evidence that was not revealed elsewhere during trial."

20

Mother's complaints do not show deficient performance. Counsel's one objection to the Department's counsel leading the witness was sustained. His eighteen pages of cross-examination during trial were more than one-quarter of the sixty-seven pages of witness examination by four attorneys. Counsel likely was guided in his decision on cross-examining Lozano by the court's statements about Mother's quest for addiction treatment. Before evidence opened in August 2025, the court discussed how it had delayed trial so that Mother could obtain treatment for addiction. The court's statement related to its discussion with Mother at the May 30, 2025 hearing concerning Mother's attempt to obtain drug treatment. The court asked, "[Mother], if you are still struggling with substance use, is it still methamphetamines?" Mother responded, "I'm not going to sit here and try to candy coat things. I do have slight slipups. I will say I'm not proud of it. But that is why I'm willing to go straight to [a drug treatment facility]." Also, before the CASA witness testified, CPS investigator Freeman testified that Mother said "she had used meth the entire pregnancy" with Child.

In light of the court's expressed knowledge of the case including Mother's quest for treatment eighteen months after Child's birth, Mother's counsel may have made a reasonable strategic decision not to focus on Lozano's assertion that Mother had admitted continued drug use.

### 3. General representation

Mother points to counsel's statement at trial as proof that his concern that she did not want his representation made him ineffective. Mother stated on the record at the May 30, 2025 hearing that she wanted to represent herself; however, when asked at the June 9, 2025 hearing if she wanted an attorney to represent her, she said, "At this current

moment, yes. But if it does go further and it's not decided on an extension, I would like to go ahead and represent myself. Just because I know ins and outs that another lawyer doesn't know." At trial, after the court denied counsel's oral motion to withdraw but before testimony began, counsel said, "I'm hesitant to say anything on anybody's behalf because I think it's asking for [an] appeal."

The record does not show any particular decision that this vaguely-worded hesitance caused counsel to make or not make. It does not show objections withheld or why they were avoided, questions un-asked, or witnesses not called other than Mother herself. Counsel may have chosen not to object more often to evidence for any number of reasons between the fact that it was not objectionable to avoiding annoying the judge by making borderline objections to admissible evidence. On the second day of trial, he attempted to contact Mother and looked for her in the courthouse during a recess of the trial. Additionally, Mother's counsel had represented her at pretrial hearings and tried helping her find treatment during the May hearing. In the absence of a record showing what actions were not taken and why, we cannot say that counsel's representation fell below the wide range of reasonable representation. *See S.L.*, 188 S.W.3d at, 395.

### B. Harm from counsel's errors

Even had we found that counsel's representation was deficient, we would not find that it harmed Mother. An ineffective assistance of counsel claim requires a showing of a deficient performance by counsel so serious as to deny the defendant a fair and reliable trial. *See J.O.A.*, 283 S.W.3d at 342.

22

Mother asserts that had counsel requested more time to allow her to get to the courthouse, she could have testified and rebutted the Department's claims. But the record shows that counsel sought and obtained additional time for Mother to appear at trial; that she did not make it within the time the trial court allotted was not within counsel's control. Mother asserts that counsel's failure to present witnesses or cross-examine witnesses regarding vital testimony allowed the Department to meet its burden. But Mother has not presented a record showing that the chief underlying basis for termination—her recurrent drug use—would have been overcome by any cross-examination or additional evidence.

Even had Mother tested negative after arriving at the courthouse during trial and testified, there is no showing that the one test and her testimony would have outweighed her history of "slipups" in using methamphetamine during a second pregnancy while a termination case regarding Child was pending. *See N.J.H.*, 575 S.W.3d at 832 (noting that parent's decision to use illegal drugs during pendency of termination suit when parent risks losing child may support finding that parent engaged in conduct that endangered child's physical or emotional well-being).

We conclude that the record does not support Mother's claim that her counsel provided representation that was so ineffective that it denied her a fair and reliable trial.

## CONCLUSION

Having found no merit in the issues presented on appeal, we affirm the decree of termination.

_____

                    Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Theofanis and Crump

Affirmed

Filed:   March 20, 2026